**EXHIBIT A**

## LABORERS LOCAL 1076 AGREEMENT

Whereas, the parties hereto desire to stabilize employment in the building industry and to agree upon wage rates and conditions of employment and to minimize stoppages of work due to strikes, boycotts, or lockouts, we, the undersigned, being the duly authorized officials of the Construction Association of Michigan, hereinafter called the "Association," representing those Employers who have appointed the Association as their collective bargaining agent, hereinafter called the "Employer" or "Employers," Michigan Laborers District Council and the Laborers' International Union of North America, AFL-CIO Local Union No. 1076, in the Metropolitan Area of Detroit comprising Oakland County, and that portion of Livingston County North of State Highway M-59 and East of Oak Grove Road, hereinafter called the "Union," do hereby assent to all the provisions of the following Agreement and do hereunto affix our signatures as evidence of understanding and acceptance of all its terms and conditions.

It is understood that the Association is acting only as an agent in the negotiation of this Agreement and that it is agent only for those Employers (individuals), partnerships, and corporations who have authorized it so to act and in no event shall it be bound as principal or be held liable in any manner for any breach of this Agreement by any of the Employers for whom it is acting or any employee of such Employers. It is further agreed and understood that the liabilities of the Employers who have authorized the negotiation and execution of this Agreement shall be several and not joint.

## ARTICLE I
### Scope of Work

1. The work to be performed under this Agreement shall be the work of the Laborers as established over the many years of operations and as awarded or recognized by the *Plan for the Settlement of Jurisdictional Disputes in the Construction Industry. (*See Page 32.)

2. It is agreed that when the Employer subcontracts work that is covered by the terms of this Agreement and to be performed on the job site, the subcontractor shall adhere to all the terms and conditions of this Agreement.

3. This Agreement shall be binding in all respects upon the parties hereto on all building, heavy construction and residential work, as hereinafter defined. The terms "building" and "residential construction work" shall include all modifications, alterations, additions and repairs to buildings, excavation for the building itself and backfilling inside of and within five feet of the building and foundations, footings and piers for buildings, EXCLUDING, however, all other building site excavation and preparation, land balancing, grading, paving, sewers, utilities and improvements,

1

and all railroad work and work covered under Highway construction and Underground construction agreements.

4. It is understood and agreed that the provisions of this Agreement, including the labor classifications and the approved wage rates, do not apply to Highway Construction. "Highway" is defined as: a thoroughfare, road or street, which any person has the right to use or any concrete slab work which is built in accordance with Highway Construction methods.

## ARTICLE II
### General Principles

1. No limitation shall be placed upon the amount of work which an employee shall perform during the work day, nor shall there be any restrictions against the use of machinery or labor-saving devices.

2. The Employer agrees to assist in obtaining a pass for a duly authorized Business Agent to enter all jobs requiring a pass, subject to the owner's rules and regulations. The duly authorized Business Agent shall be permitted to visit the job, with the least interference to the work. Upon his arrival at the jobsite, the Business Agent shall report his presence to the Employer's designated jobsite representative if available.

3. The Employer shall not collect dues for the Union and shall not in any way act as agent of the Union, except the Employer agrees that when an employee becomes a potential member of the Union and the employee has signed a proper Authorization Card indicating the total amount to be deducted from his wages for initiation fees or reinstatement fees, the Employer will remit them to the Union on a biweekly basis.

4. Tools, boots or implements other than those customarily furnished by Laborers necessary to perform any kind of labor, shall be supplied by the Employer. The Employer shall furnish boots which can be worn over shoes. The employee shall exercise diligence and care in the use of all employer-furnished items, and shall return the items for replacement or upon completion of the work.

5. The Employer shall provide proper sanitation and suitable containers for drinking water with paper cups or a bubbler.

6. A safe and sanitary shelter house (weather demanding) shall be supplied by the Employer in which Laborers may partake of their lunch and hang their clothing.

7. Membership cards of members in good standing in other Local Unions affiliated with the Laborers' International Union of

North America, AFL-CIO shall be recognized by the Union.

8. All Employers shall provide protection as required under the provisions of the Workers' Compensation Law of the State of Michigan and shall elect to become subject to the Michigan Employment Security Agency (M.E.S.A.).

9. Upon request of the Union, the Employer agrees to furnish the names of his subcontractors who employ Laborers.

10. **Parking.** If free parking is not available, Employer will furnish same.

11. **Prejob Conference.** Upon request of the Employer or the Union, a prejob conference shall be held. All requests for a pre-job conference are to be directed to the Detroit Building and Construction Trades Council.

## ARTICLE III
### Steward

1. The Steward shall be the second Laborer on the job performing work under this Agreement. A working Steward shall be appointed by the Business Manager in the geographical area in which the project is located. If, in the opinion of the Business Manager of the Union, there is no employee on the job who is capable of performing the duties of a Steward, the Business Manager shall be given the opportunity to recommend a responsible applicant to perform this service for the Employer and the Union, with the understanding that should the honest intent of the foregoing be violated the Union agrees to meet immediately and discuss the alleged complaint in the interest of both parties. The Steward shall be put to work at any time there is more than one Laborer on the job performing work under this Agreement.

2. The Employer or his representative agrees not to lay-off, discharge or transfer the Steward off the job until he has discussed the matter with the Business Manager who shall meet for such discussion on the jobsite within twenty-four (24) hours after notification to the Union Office, Saturday, Sunday or Holiday excluded.

3. When employees covered by this Agreement are to be terminated by lay-off, the Steward shall be one of the last two (2) working Laborers laid off provided he is capable of performing his work assignments. This provision shall not apply to Acting Stewards.

4. If the Steward is not on the job for any reason the Union can appoint an Acting Steward to act in his place so that the Union

3

can have a representative on the job whenever employees covered by this Agreement are working.

5. The Steward shall be allowed reasonable time to perform his Steward duties with the least interference to the job. The Steward's activities shall be conducted on the Employer's immediate job site.

6. The Steward shall have no authority to take strike action or any other action interrupting the Employer's business.

7. The Employer is responsible for the care of his injured or sick employees, and the Steward shall also render assistance in cooperation with the Employer including accompanying such injured or sick employee to the doctor, clinic or hospital and subsequently home, if the doctor deems it necessary, without any loss of time. Employees who, as a result of a disabling on-the-job injury, are unable to complete a full day's work shall nevertheless be paid for the full day on which such injury occurred.

8. When a job has started and for some reason it has been closed down or delayed, the Steward shall be the second Laborer called back provided he is capable of performing his work assignments. If personal contact is not made, the Employer shall have written evidence of attempted notification such as a copy of a telegram.

9. The Steward shall notify the Foreman of any unsafe equipment or working conditions.

10. For purposes of this Article, foremen performing Laborers' work under this Agreement shall be considered a Laborer.

## ARTICLE IV
### Employment

1. (a) BEYOND THE EMPLOYER'S REGULAR EMPLOYEES, INCLUDING LAID-OFF, LAID OFF AND COLLECTING UNEMPLOYMENT AND/OR TRANSFERRED FROM ANOTHER PROJECT OF THE SAME EMPLOYER, THE EMPLOYER AGREES TO GIVE THE LOCAL UNION IN THE AREA AN OPPORTUNITY TO SUPPLY ANY ADDITIONAL EMPLOYEES.

(b) A REGULAR EMPLOYEE SHALL BE DEFINED AS ONE WHO HAS BEEN ON THE PAYROLL OF SAID EMPLOYER WITHIN THE IMMEDIATE PAST NINE (9) MONTHS.

2. When requested, the Union agrees to furnish competent workers upon notification to the Business Manager or Business

Agent of the Union and further, the Employer agrees that beyond his regular employees he will give the Local Union in the area an opportunity to supply any additional employees. The Employer retains his right of freedom of selection of employees from among all applicants.

3. The Employer and the Union agree that there will be no discrimination in employment based upon race, color, creed, national origin, sex or age, and that nothing elsewhere in this Agreement shall be construed as requiring or permitting such discrimination. The Employer and the Union further agree that each will cooperate with the other in taking such affirmative actions by either or both as are proper and necessary to ensure equality of opportunity in all aspects of employment.

4. (a) The Employers agree that in the employment of workers to perform the various classifications of labor required in the work under this Agreement, they will not discriminate against applicants because of membership or nonmembership in the Union. Each employee shall, as a condition of employment thereafter, become and remain a member of the Union for the term of his employment after the seventh (7th) calendar day after his employment by any Employer or Employers covered by this Agreement in this area. The seven (7) day period within which an employee agrees to join the Union shall be computed from the first day such employee enters the employment of any Employer covered by this Agreement.

(b) In the event the National Labor Relations Act is amended, while this Agreement is in force, so that an employee may lawfully be required to become a member of a Union as a condition of employment in less than seven (7) days, then such shorter period of time shall immediately become operative under this Agreement, notwithstanding the provisions of Paragraph (a) above.

(c) The Employer shall not be obligated hereunder to discharge or discriminate against any employee for nonmembership in the Union:

  i. If he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members; or

  ii. If he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic membership dues (including working dues) and initiation fees uniformly required as a condition of acquiring or retaining membership; and

5

iii. The Employer shall be furnished with a notice in writing by the Union, signed by the proper officer, setting forth that the employee has refused to join the Union, although he has been offered membership on the same terms as other members, or that the employee's membership in the Union has been terminated for reason of nonpayment of periodic membership dues (including working dues) or initiation fees, and that the Union requests that said employee be discharged for one of these above reasons.

**ARTICLE V**
**Wages and Fringe Benefit Contributions**

1. The schedule of rates per hour shall be as follows:

**EFFECTIVE FIRST FULL PAYROLL PERIOD**
**COMMENCING ON OR AFTER JUNE 1, 2009**
**THROUGH MAY 31, 2010**

**CONSTRUCTION LABORER, MASON TENDER, CARPENTER TENDER, DRYWALL HANDLER, CONCRETE CHUTE AND CONCRETE BUCKET HANDLER, CONCRETE LABORER, AND CEMENT FINISHER TENDER**

|  | 1st Shift | 2nd Shift | 3rd Shift |
|---|---|---|---|
| *Base Wage | $23.09 | $23.39 | $23.69 |
| *Vacation and Holiday | 2.45 | 2.45 | 2.45 |
| Insurance | 5.95 | 5.95 | 5.95 |
| Pension | 6.85 | 6.85 | 6.85 |
| Training Fund | .37 | .37 | .37 |
| L.E.C.E.T. | .05 | .05 | .05 |
| GROSS WAGE | $38.76 | $39.06 | $39.36 |
| I.A.P. | .10 | .10 | .10 |

**FOREMAN**

|  | 1st Shift | 2nd Shift | 3rd Shift |
|---|---|---|---|
| *Base Wage | $24.34 | $24.64 | $24.94 |
| *Vacation and Holiday | 2.45 | 2.45 | 2.45 |
| Insurance | 5.95 | 5.95 | 5.95 |
| Pension | 6.85 | 6.85 | 6.85 |
| Training Fund | .37 | .37 | .37 |
| L.E.C.E.T. | .05 | .05 | .05 |
| GROSS WAGE | $40.01 | $40.31 | $40.61 |
| I.A.P. | .10 | .10 | .10 |

**SIGNAL MAN (on sewer and caisson work); AIR, ELECTRIC OR GASOLINE TOOL OPERATOR (including concrete vibrator operator, acetylene torch and air hammer operator); SCAFFOLD BUILDER; CAISSON WORKER**

|                      | 1st Shift | 2nd Shift | 3rd Shift |
|----------------------|-----------|-----------|-----------|
| *Base Wage           | $23.35    | $23.65    | $23.95    |
| *Vacation and Holiday | 2.45      | 2.45      | 2.45      |
| Insurance            | 5.95      | 5.95      | 5.95      |
| Pension              | 6.85      | 6.85      | 6.85      |
| Training Fund        | .37       | .37       | .37       |
| L.E.C.E.T.           | .05       | .05       | .05       |
| GROSS WAGE           | $39.02    | $39.32    | $39.62    |
| I.A.P.               | .10       | .10       | .10       |

**LANSING BURNER, BLASTER AND POWDER MAN**

|                      | 1st Shift | 2nd Shift | 3rd Shift |
|----------------------|-----------|-----------|-----------|
| *Base Wage           | $23.84    | $24.14    | $24.44    |
| *Vacation and Holiday | 2.45      | 2.45      | 2.45      |
| Insurance            | 5.95      | 5.95      | 5.95      |
| Pension              | 6.85      | 6.85      | 6.85      |
| Training Fund        | .37       | .37       | .37       |
| L.E.C.E.T.           | .05       | .05       | .05       |
| GROSS WAGE           | $39.51    | $39.81    | $40.11    |
| I.A.P.               | .10       | .10       | .10       |

**FURNACE BATTERY HEATER TENDER, BURNING BAR AND OXY-ACETYLENE GUN, EXPEDITER MAN, TOP AND/OR BOTTOM MAN (Blast Furnace Work)**

|                      | 1st Shift | 2nd Shift | 3rd Shift |
|----------------------|-----------|-----------|-----------|
| *Base Wage           | $23.59    | $23.89    | $24.19    |
| *Vacation and Holiday | 2.45      | 2.45      | 2.45      |
| Insurance            | 5.95      | 5.95      | 5.95      |
| Pension              | 6.85      | 6.85      | 6.85      |
| Training Fund        | .37       | .37       | .37       |
| L.E.C.E.T.           | .05       | .05       | .05       |
| GROSS WAGE           | $39.26    | $39.56    | $39.86    |
| I.A.P.               | .10       | .10       | .10       |

I.A.P. — Industry Advancement Program
*Subject to Federal Withholding and F.I.C.A.

**EFFECTIVE FIRST FULL PAYROLL PERIOD
COMMENCING ON OR AFTER JUNE 1, 2009
THROUGH MAY 31, 2010**

**CLEANER/SWEEPER LABORER,
FURNITURE LABORER†**

|                      | 1st Shift | 2nd Shift | 3rd Shift |
|----------------------|-----------|-----------|-----------|
| *Base Wage           | $17.64    | $17.94    | $18.24    |
| *Vacation and Holiday| 2.45      | 2.45      | 2.45      |
| Insurance            | 5.95      | 5.95      | 5.95      |
| Pension              | 6.85      | 6.85      | 6.85      |
| Training Fund        | .37       | .37       | .37       |
| L.E.C.E.T.           | .05       | .05       | .05       |
| GROSS WAGE           | $33.31    | $33.61    | $33.91    |
| I.A.P.               | .10       | .10       | .10       |

†See Articles VI and VII.

**EFFECTIVE FIRST FULL PAYROLL PERIOD
COMMENCING ON OR AFTER JUNE 1, 2010
THROUGH MAY 31, 2011**

Effective June 2010 the parties have agreed to a Gross Wage increase for the Construction Laborer of $.80 per hour. The scale of wages for the various classifications of work under this Agreement will be issued as a supplement to this Agreement.

**LABORER APPRENTICE RATES**
**EFFECTIVE FIRST FULL PAYROLL PERIOD**
**COMMENCING ON OR AFTER JUNE 1, 2009 THROUGH MAY 31, 2010**

**First Shift**

|  | Base Wage | Vac | Insur | Pens | Training Fund | LECET | Gross Wage | IAP |
|---|---|---|---|---|---|---|---|---|
| 1st Period (75%)............ | $17.32 | 2.45 | 5.95 | 6.85 | .37 | .05 | 32.99 | .10 |
| 2nd Period (80%) .......... | 18.47 | 2.45 | 5.95 | 6.85 | .37 | .05 | 34.14 | .10 |
| 3rd Period (85%) ........... | 19.63 | 2.45 | 5.95 | 6.85 | .37 | .05 | 35.30 | .10 |
| 4th Period (95%) ........... | 21.94 | 2.45 | 5.95 | 6.85 | .37 | .05 | 37.61 | .10 |

**Second Shift**

|  | Base Wage | Vac | Insur | Pens | Training Fund | LECET | Gross Wage | IAP |
|---|---|---|---|---|---|---|---|---|
| 1st Period (75%)............ | $17.54 | 2.45 | 5.95 | 6.85 | .37 | .05 | 33.21 | .10 |
| 2nd Period (80%) .......... | 18.71 | 2.45 | 5.95 | 6.85 | .37 | .05 | 34.38 | .10 |
| 3rd Period (85%) ........... | 19.88 | 2.45 | 5.95 | 6.85 | .37 | .05 | 35.55 | .10 |
| 4th Period (95%) ........... | 22.22 | 2.45 | 5.95 | 6.85 | .37 | .05 | 37.89 | .10 |

**LABORER APPRENTICE RATES**
**EFFECTIVE FIRST FULL PAYROLL PERIOD**
**COMMENCING ON OR AFTER JUNE 1, 2009 THROUGH MAY 31, 2010**

**Third Shift**

|  | Base Wage | Vac | Insur | Pens | Training Fund | LECET | Gross Wage | IAP |
|---|---|---|---|---|---|---|---|---|
| 1st Period (75%)............ | $17.77 | 2.45 | 5.95 | 6.85 | .37 | .05 | 33.44 | .10 |
| 2nd Period (80%) .......... | $18.95 | 2.45 | 5.95 | 6.85 | .37 | .05 | 34.62 | .10 |
| 3rd Period (85%) ........... | $20.14 | 2.45 | 5.95 | 6.85 | .37 | .05 | 35.81 | .10 |
| 4th Period (95%) ........... | $22.51 | 2.45 | 5.95 | 6.85 | .37 | .05 | 38.18 | .10 |

**EFFECTIVE FIRST FULL PAYROLL PERIOD**
**COMMENCING ON OR AFTER JUNE 1, 2010 THROUGH MAY 31, 2011**
Apprentice wage rates effective June 2010 will be issued as a supplement to this Agreement.

2. The Gross Wage shown in these schedules includes required payments for Wages, Vacation and Holiday, Insurance, Pension and Training Fund Contributions. Failure to pay the Base Wage and the funded fringe benefit contributions when due is payment of less than the gross wage and shall constitute a status of delinquency and a violation of this Agreement. The Union shall withhold its members from Employers who fail to fully comply with the foregoing. In the event any Employer is delinquent in the payment of Wages or his contributions to the Health and Welfare, Pension, Vacation and Holiday, or Training Funds, the Union, after giving the Employer and any Association of which he is a member, twenty-four (24) hours notice (excluding Saturday, Sunday and Holidays) by registered mail or telegram of such delinquency, shall have the right to take strike action against such Employer, notwithstanding any other provisions of this Agreement.

3. SHIFT WAGES. (For shift conditions see ARTICLE XXI.

4. All operations directly connected with the interior work described as follows: blast furnace, down comer, uptakes, stoves, gas washers, burners, chimney, bustle pipe, coke ovens (battery), hot main pipe, flouers, slab furnaces, soaking pit, oxygen furnace, vessel, cupola, pickle line, glass melting furnaces, lime kiln, open hearth, refractory in boilers and incinerators shall receive fifty cents ($.50) more per hour in base pay than the Construction Laborer's rate. A prejob conference shall be held on the above described work or where similar excessive exposure conditions exist, if requested by the Union.

5. The rate of wages for caisson work shall apply for the entire depth of a caisson below the adjacent general excavated ground level.

6. When a Laborer is assigned to an Air, Electric or Gasoline Tool any time during the forenoon period, he shall be paid the higher rate all during the forenoon period from the time he reported on the job. This rule shall also apply during the afternoon period or any other shift period.

7. No Laborer shall be allowed to work on a job unless he is to be paid at the regular rate of wage.

8. When Laborers start to work and for some reason other than weather work is stopped after employees have worked into the sixth (6th) hour they shall either work or be paid for eight (8) hours.

9. If an employee is called back to work within twenty-four (24) hours from the start of his regular shift, after he has completed

his regular shift and has left the jobsite, he shall be paid a minimum of two (2) hours at double the prevailing shift rate. If shift is completed and job reverts back to one normal shift, then this would not apply.

10. The Employer agrees to pay monthly as shown above into the Laborers' Local 1076-Employers Cooperation and Education Trust (LECET), which was created and is maintained under an Agreement and Declaration of Trust dated July 19, 1993, and which is hereby incorporated herein by reference. Contributions shall be made on actual hours worked whether paid at straight time or premium rates.

11. All operations connected with the maintenance, renovation or repair of all firebrick and refractory work shall be paid the Furnace Battery Heater Helper scale of wages. A prejob conference shall be held on the above described work or where similar excessive exposure conditions exist, if requested by the Union.

## ARTICLE VI
### Cleaner/Sweeper

1. The following language shall govern the application of the CLEANER/SWEEPER Classification:

   (a) Before Article VI regarding the cleanup rate will apply, prior approval shall be obtained from the Business Manager who has sole authority to allow use of the cleanup rate.

   (b) This would apply only to a Laborer or Laborers that are assigned to cleanup work for a full shift.

   (c) The cleanup rate would apply on general cleanup only, after the masonry and heavy concrete cleanup is completed.

   (d) Cleanup for the purpose of this provision is defined as the removal and loading of all crates, boxes, and packaging waste material; washing and cleaning of all walls, partitions, ceilings, windows, bathrooms, kitchens and all fixtures and facilities therein; sweeping, mopping, washing, waxing, and polishing or dusting of all floors or areas.

   (e) Any Employer who performs work as a General Contractor, Prime Contractor, or Construction Manager shall coordinate all job cleanup between the trades or other subcontractors.

   (f) When a Laborer performs the work of cleanup of a jobsite, the wage rate shall be as specified in Article V.

   (g) The Gross Wage of the Cleaner/Sweeper Laborer shall be five dollars and forty-five cents ($5.45) less than the Construc-

tion Laborer's Gross Wage. A Cleaner/Sweeper's Gross Wage shall be allocated so that 100% of the Construction Laborer's fringe benefit contributions are paid with the remainder of the Cleaner/Sweeper's Gross Wage paid as his Base Wage.

## ARTICLE VII
## Furniture Laborer

1. The Cleaner/Sweeper scale of wages may be paid to Laborers who are assigned the unloading of furniture to the point of installation, the setting in place or relocation of furniture.

## ARTICLE VIII
## Apprenticeship

1. Apprentice Laborers shall not constitute more than twenty-five percent (25%) of the Laborers employed by the Employer at each jobsite. To determine the number of Laborers employed, all classifications of Laborers, except nonworking foremen and Cleaner/Sweeper Laborers, shall be counted. To illustrate, after the Employer is employing three (3) Journeyman Laborers at a jobsite, the fourth person may be an Apprentice Laborer. After the fifth, sixth and seventh persons employed at the jobsite are Journeyman Laborers, then the eighth person may be another Apprentice Laborer. Upon request of the Employer, the Business Manager has discretion to permit the employment of Apprentice Laborers in excess of 25% of the Journeyman Laborers employed by the Employer on a jobsite.

2. Before a person may be classified as an Apprentice Laborer and paid the Apprentice scale of wages, the Employer must notify the Union and the Apprenticeship Coordinator in writing by completing the "Intent to Hire Letter" available from the Michigan Laborers' Training & Apprentice Fund. The Intent to Hire Letter may be submitted to the Union and the Apprentice Coordinator by mail or facsimile. Hours worked before an Intent to Hire letter is submitted shall be paid at the full Journeyman Laborer scale of wages.

3. An Apprentice's scale of wages is determined by the number of his work hours and by the number of his hours of classroom instruction. There are four pay classifications for Apprentice Laborers. An Apprentice must satisfy both the work hour and the training requirement for each pay classification before qualifying for the higher scale of wages in the next classification. The Apprenticeship Committee may grant a certain amount of advance placement to Apprentices who demonstrate proof of related experience and knowledge. To become a Journeyman Laborer, an Apprentice must have worked 4,000 hours and have 400 hours of classroom training. Apprentices are paid a percentage of the Construction Laborer Base Wage and full

13

Construction Laborer fringe benefit contributions. The Apprentice Laborer should be teamed with a Journeyman Laborer throughout his/her Apprenticeship. The Apprentice Coordinator will track each Apprentice as he/she progresses through the Apprentice Program and shall classify each Apprentice in his/her appropriate pay classification.

4. All registered apprentices will be compensated in accordance with the following schedule:

First Period - 1,000 work hours or less and 100 training hours or less - 75% of Journeyman Base Wage.

Second Period – 1,001 to 2,000 work hours and 101 to 200 training hours – 80% of Journeyman Base Wage.

Third Period – 2,001 to 3,000 work hours and 201 to 300 training hours – 85% of Journeyman Base Wage.

Fourth Period – 3,001 to 4,000 work hours and 301 to 400 training hours – 95% of Journeyman Base Wage.

## ARTICLE IX
## Dues Check-Off

1. Pursuant to the Agreement and Declaration of Trust between the Union and the Association governing the LABORERS' VACATION AND HOLIDAY TRUST FUND--DETROIT AND VICINITY, dated June 12, 1968 and including the Second Amendment dated October 1, 1974, which is incorporated herein by reference, Employees may voluntarily execute a written authorization for an assignment of an amount per hour of their Vacation and Holiday Fund contribution for the payment of working dues which are uniformly required of all Employees working within the jurisdiction of the Union. The Employer appoints the Trustees of the LABORERS' VACATION AND HOLIDAY TRUST FUND--DETROIT AND VICINITY as its agent for the receipt of said written authorizations and for the deduction of said working dues. Upon receipt of written authorizations signed by the Employee, the administrator shall deduct the amount per hour as working dues from Vacation and Holiday Fund contributions for said Employee received by the Administrator, prior to depositing such contributions into the Vacation and Holiday Fund.

2. For any Employee who has not executed an authorization for the assignment of working dues, the Fund will, upon written request, remit to the Employee at regular intervals at such times as determined by the Trustees of the Fund, such a sum as would be remitted to the Union if such an authorization had been executed by the Employee.

3. The authorization for the assignment of working dues shall be irrevocable for the period of one (1) year, or until the termination of this collective bargaining agreement, whichever period is

less, unless written notice is given by the Employee to the Trustees of the Fund and not more than sixty (60) days before any periodic renewal date.

4. The Union shall indemnify and save each Employer, the Association, and the Trustees harmless against any duplication of payment and any and all claims, demands, suits or other forms of liability that may arise out of or by reason of action taken by or not taken by the Employer, the Association or Trustees for the purpose of complying with this Article, provided, however, the Union shall not be responsible for any liability caused by the gross negligence or intentional misconduct of the Employer, the Association or Trustees.

5. The Union agrees to bear all administrative costs involved in the deduction of the working dues from the Vacation and Holiday Fund and that there will be no cost to the Fund.

6. It is mutually agreed and understood the Employer is not required to obtain the signed authorizations of assignment but that the Union shall be responsible for obtaining the authorizations from the Employees.

## ARTICLE X
### Insurance

1. The Employer shall pay the amount specified in Article V per hour for all hours worked by each Employee covered by this Agreement, to Laborers' Metropolitan Detroit Health & Welfare Fund and agrees to be bound by all provisions of the Declaration of Trust of the Laborers' Metropolitan Detroit Health & Welfare Fund, dated October 7, 1973, which is hereby made part of this Agreement by reference.

2. Insurance contributions shall be computed for all hours worked without regard to whether the Employee was working for straight time or overtime.

3. These contributions shall be paid by the 15th day of the month following the month the Employee worked. Contributions shall be deposited each month to such depository as may be designated by the Trustees of the Fund.

4. Local 1076 may allocate two cents ($.02) per hour of the Gross Wage to the Laborers' Safety and Health Fund. The Insurance Fund will make this contribution and no additional paperwork will be required of Employers.

## ARTICLE XI
### Pension

1. The Employer agrees to be bound by all provisions of the Agreement and Declaration of Trust of the Laborers' Pension

Trust Fund - Detroit and Vicinity, dated July 9, 1958, as it has been or subsequently is amended by the parties thereto, which is hereby made part of this Agreement by reference. The Employer further agrees to contribute monthly the amount specified in Article V for "Pension" into the depository designated by the Trustees of the Pension Fund for each paid hour for each employee covered by this Agreement. When the work performed is on an overtime basis the Pension contribution shall be on an overtime basis.

2. (a) The Plan Manager of the Pension Fund shall, on a monthly basis, determine the amount to be paid to participants and beneficiaries of the Detroit and Vicinity Laborers Excess Benefit Plan in the following month. That amount shall be the aggregate of benefits calculated in accordance with the provisions of the Pension Trust Fund's Plan in excess of the payment permitted under Section 415 of the internal Revenue Code increased to reflect FICA, FUTA and any other similar taxes applicable thereto. Each payment to each participant or beneficiary of the Excess Benefit Plan, net of FICA, FUTA or any other similar taxes, shall be equal to the difference between the benefit to which that individual would otherwise be entitled and the payment permitted to be paid to that individual under Section 415 of the internal Revenue Code.

(b) Before the contributions made by Employers for Pension are allocated to the Laborers' Pension Trust Fund - Detroit and Vicinity, the Plan Manager shall cause the moneys necessary to pay the total amount determined under the preceding paragraph plus any administrative expenses incurred to be deducted and paid to the Excess Benefit Plan for distribution.

3. The Union and the Employers, parties to this Agreement and the Declaration of Trust of the Laborers' Pension Trust Fund, Detroit and Vicinity, shall appoint an equal number of Trustees to the Pension Fund.

**4. Negotiated wage increases will be allocated first to satisfy the Pension Fund contribution.**

## ARTICLE XII
### Vacation and Holiday

1.     The Employer agrees to pay monthly into the Laborers' Vacation and Holiday Trust Fund, Detroit and Vicinity, under the terms of an Agreement dated June 12, 1968 between the parties hereto and which is hereby made a part of this Agreement by reference, the amount specified in Article V per paid hour for each employee covered by this Agreement. When the work performed is on an overtime basis, the contribution per hour covering the Vacation and Holiday fringe shall also be on an overtime basis. The Board of Trustees shall be authorized to

determine the distribution date of benefits and the cut-off date of contributions each year.

## ARTICLE XIII
### Collection of Fringe Benefit Contributions, Investigation, Collection Fees and Charges

1. The Employer agrees to furnish the Trustees of the various fringe benefit funds provided for in this Agreement, upon request, such information and reports as the Trustees may require in the performance of their duties. The Employer further agrees that the Trustees, or any agent authorized by the Trustees, shall have the right to enter upon the premises of the Employer to perform an audit to determine whether the Employer is complying fully with the provisions of this Agreement (and the trust documents incorporated herein by reference) regarding Employer contributions. For that purpose the Trustees, or their agent, shall have access to all necessary Employer records, including:

(a) Original payroll records showing each employee's name, address, Social Security number, occupation, straight time and overtime hours worked, rate of pay, gross pay, F.I.C.A. deduction, Withholding Tax deductions, other deductions, check number and net pay.

(b) Each employee's earnings record by calendar year with quarterly totals.

(c) Copy of W-4 Form filed for each employee.

(d) Copy of W-2 Form filed for each employee.

(e) Copy of Social Security Quarterly Report filed (Form 941), and canceled checks supporting payment of same.

2. This will permit the Trustees to determine whether the Employer is complying fully with the provisions of this Agreement regarding Employer contributions.

3. The Employer understands and agrees that the Trustees of the fringe benefit funds provided for by this Agreement have the power, as provided in their respective Trust Agreements, to fix a schedule of cost of collection fees or charges, in the nature of liquidated damages, to be assessed against any Employer who fails to make the contributions required hereunder in the correct amount and when due. The Employer further agrees that if, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, he is found to have been substantially inaccurate in reporting, or late in remitting, contributions due, he may be charged the costs of making such audit, in the discretion of the

17

Trustees involved. Finally, the Employer agrees that if, as a result of the Employer's failure to report and pay fringe benefit contributions and liquidated damages as required here under, the Trustees find it necessary to institute legal proceedings, the Employer shall be charged with all costs, including actual attorneys fees, incurred by the Funds as a result of such litigation.

4. The Trustees of the various fringe benefit funds provided for in this Agreement shall jointly establish and maintain a program, including such compliance auditing and litigation as they deem necessary, for making such reasonable, diligent and systematic efforts as are appropriate under the circumstances to determine and collect contributions due to the funds from Employers, as well as liquidated damages and litigation costs. The costs of maintaining the program shall be allocated among the funds as follows: Pension - **53 2/3%,** Health Care **- 34 1/3%,** Vacation & Holiday - **9 1/2%.** Training and Apprenticeship **– 2%,** and LECET – ½% divided evenly between the two LECET trusts.

## ARTICLE XIV
### Industry Advancement Program

1. An Employer performing residential, commercial, industrial and institutional building work or heavy construction, agrees to pay into the Industry Advancement Program of the Construction Association of Michigan, the sum of Ten Cents ($.10) per hour for all hours worked by Employees covered by this Agreement, to a maximum total contribution of $15,000 in any calendar year in accordance with the Supplemental Industry Advancement Program Agreement which is hereby made part of this Agreement by reference. These contributions will be reported on the forms provided and sent to such depository as shall be named by the Association.

## ARTICLE XV
### Foreman

1. The foreman shall be selected by and be the representative of the Employer. He shall not be required to violate any part of this Agreement as a condition of employment. When six (6) or more members of the Union are employed, one (1) shall act as a working foreman and receive the foreman rate of pay. He shall be paid one dollar and twenty-five cents ($1.25) per hour more than the Construction Laborer's rate.

## ARTICLE XVI
### Pay Day

1. All employees working under this Agreement shall be paid once each week in currency or check on the job within seventy-two (72) hours after the closing of the pay day for the week. Any Laborer failing to receive his wages on the regular pay day, due to the fault of the Employer, shall immediately notify the Business Manager, who shall proceed at once to collect the

amount due, including pay for waiting time not exceeding one day, which shall be charged until the wages are received. This waiting time is to apply to working hours only and is intended to apply to the Employer who willfully neglects or does not make it his duty to pay his employees at the proper time. Pay checks given to employees by the Employer must be drawn from local banks within the jurisdiction of this contract unless Union approves other banks.

2. (a) If a Laborer is discharged or laid off from employment by the Employer (or his representative), he shall be paid off immediately. With prior approval of the Business Manager, an Employer may instead mail the pay-off check to the employee by certified mail (no return receipt requested) before the end of the next business day without penalty. If the check is not mailed before the end of the next business day, the employee shall be paid an additional two (2) hours pay for each twenty-four hours of delay retroactive to the day of lay-off/discharge.

(b) Without prior approval of the Business Manager allowing the mailing of the pay-off check, when an Employer gives the employee an office order, he shall be paid one hour extra, or if he is not paid until the next morning, he shall be paid for all working time he is forced to wait until paid.

(c) The Employer agrees to furnish each employee, whose employment is terminated, a copy of the layoff slip. A temporary work stoppage for reasons other than weather and not exceeding one work day will not be considered a lay off.

(d) At the employee's discretion, as an alternative to issuing a payroll check, a lay-off check or a discharge check, the Employer may make payment by electronic direct deposit into an account designated by the employee. When direct deposit is used, pay stubs will be mailed no later than the next business day.

3. When an Employer transfers men from one job to another during working hours, they shall be paid for the time spent in traveling between the two jobs and they shall not be required to go from one job to another during their lunch period without pay.

4. The Employer agrees to give any employee who is laid off or discharged, not less than one (1) hour's notice of the lay off or the discharge. On an extremely large job, or jobs within a large industrial plant requiring check out of tools, one and one-half (1½) hours notice shall be given. The employee's pay-off check (if not mailed as provided in Paragraph 2 of this Article) will be made available for the steward's inspection one and one-half (1½) hours prior to lay off. The employee shall be furnished a separation slip at the time of layoff showing the reason for termination.

5. When weather does not permit work to start on pay day, pay checks shall be issued between the hours of 8:00 a.m. and 9:00 a.m. In case issuance of pay checks is not started until after 9:00 a.m., each employee who has waited from 8:00 a.m. for his check shall be paid for a minimum of waiting time of one and one-half (1½) hours, from 8:00 a.m. to 9:30 a.m. If the checks are not distributed at 9:30 a.m., waiting time shall be paid for by the Employer in one-half (½) hour intervals, but not to exceed the end of a normal working day. The Employer shall not be obligated to pay for waiting time if he or his representative appears on the job with pay checks for issuance any time between the hours of 8:00 a.m. and 9:00 a.m., nor shall he or his representative be required to remain on the job longer than to issue checks or arrange for the issuance of checks.

6. The employee's pay stub shall show the straight time hours worked, overtime hours worked, his gross pay, deductions for Social Security, Withholding Tax, Vacation and Holiday, total deductions, his pay and date of pay.

## ARTICLE XVII
### Hours

1. Eight (8) hours shall constitute a day's work between the hours of 8:00 a.m. and 4:30 p.m., Monday to Friday inclusive, except for shift work and the 4-10 work week hereinafter described, and pay for time worked during those hours shall be at the regular wage rate.

2. **Flexible Starting Time.** The Employer, without the payment of premium time, may modify the starting time of any employee from the regular starting time of 8:00 a.m., to any time from 7:00 a.m. to 8:00 a.m.

3. On work where the regular prescribed hours cannot be worked, special work time provisions may be arranged between the Employer and the Union.

4. 4-10 Work Week. If a holiday is celebrated on Friday or Monday, four 10-hour straight-time weekdays may be worked during the calendar week in which a holiday is celebrated to enable Laborers to have a 3-day weekend. In addition, the Employer may choose to work four 10-hour, straight-time weekdays during the week preceding or following this holiday week, to enable Laborers to have a 4-day weekend. Jobs which have worked overtime on a regular basis within two weeks of the holiday may not change the work week in accordance with this Section. Notice must be given to the Union at least three (3) work days before the first 4-10 day is worked.

5. **Lunch Period.** If job circumstances require the employee to

work during the usual lunch period from 12:00 Noon to 12:30 p.m. and take his unpaid lunch period at some other time, then the work between 12:00 Noon and 12:30 p.m. shall be paid for at time and one-half. The employee shall not be required to work more than five (5) hours between eating periods.

6. **Beverage Break.** The employee shall be allowed to have nonalcoholic beverages near his work station, once for fifteen (15) minutes in the middle of the first half of his shift and once for fifteen (15) minutes in the middle of the second half. The Union agrees this shall definitely not be abused and in no case will job operations be interrupted.

## ARTICLE XVIII
## Concrete Pours

1. When concrete is poured on the job on a regular work day, the Laborer placing concrete will be worked or paid a minimum of three (3) hours, weather permitting. When the Laborer placing such concrete works greater than four (4) hours, but less than six (6) hour, he shall be paid a minimum of six (6) hours; where the Laborer works into the sixth (6th) hour of his regular shift, he shall be paid a minimum of eight (8) hours, weather permitting.

2. Where concrete is poured on a job on Saturday, Sunday or Holiday and the Laborer placing such concrete works greater than four (4) hours, but less than six (6) hours; he shall be paid a minimum of six (6) hours; where the Laborer works into the sixth (6th) hour of his regular shift, he shall be paid a minimum of eight (8) hours, weather permitting.

3. The Employer agrees to furnish to the Vibrator Operator on concrete pours, protective gloves.

## ARTICLE XIX
## Heaters

1. When one or more propane or salamander heaters for drying plaster, concrete, mortar, fireproofing or other aggregate is tended, a laborer will perform the tending. The Employer determines in his sole discretion when such heaters will be tended and, when tended, the duties to be performed by the tending laborer. Tending is defined as including the connection/disconnection of fuel tanks, and the turning on/off of the heater.

2. When the Employer changes fuel tanks for heaters with his own employees, laborers will change the tanks. If the Employer has contracted with a service company to provide the bulk tanks over 100 pounds, the service company employees may change the bulk tanks even if such employees are not represented by laborers.

# ARTICLE XX
## Overtime and Holidays

1. One and one-half the straight-time wage rate shall be paid for the first two (2) hours of premium time worked per day, Monday through Friday. Eight (8) hours of work may be performed on Saturdays for which one and one-half the straight-time rate shall be paid. Work performed beyond the first two (2) hours of premium time, Monday through Friday, or beyond eight (8) hours of work on Saturdays shall be paid at double the straight-time wage rate.

2. When an employee reports to work after the scheduled starting time with the Employer's permission to enable the employee to attend to personal business, that employee will be paid overtime only after he has worked eight hours that day.

3. All legal holidays shall be observed by the Local Union. The legal holidays recognized are: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day.

4. Upon notice of at least three (3) working days to the Employer, an employee may take off Martin Luther King's Birthday without pay and without reprimand.

5. Double time shall be paid for work done on Sundays and holidays. When a holiday falls on Sunday, both parties hereto shall recognize as a holiday the date on which it is legally celebrated. If a holiday falls on a Sunday and the following Monday is worked, the rate of pay shall be at double time.

6. The Employer agrees to notify the Business Manager of the Union in advance whenever the Employer plans to perform work on Saturdays and/or Sundays except where cases of emergency do not permit.

7. If or when an employee who has worked for the Employer a minimum of three (3) months wishes to take his vacation, the employee after giving fourteen (14) days written notice shall be allowed to take his vacation, two (2) weeks maximum, without reprisal or having to sign a termination slip.

# ARTICLE XXI
## Shift Work

1. Shift wage rate shall apply for shift work for one (1) day or any number of days. Shift work done between the hours of 8:00 a.m. Saturday and 8:00 a.m. Monday, or on holidays shall be paid for at the overtime rate as specified in Article V. The complete day's work will end at the conclusion of the three (3) shifts whatever day worked.

2. When two (2) shifts are employed, they shall be paid in accordance with the schedule in Article V and each shift shall work eight (8) hours before overtime applies.

3. When three (3) shifts are employed, the first shift shall work eight (8) hours, the second shift shall work seven and one-half (7½) hours, and the third shift shall work seven (7) hours and be paid according to the schedule in Article V.

4. (a) Starting hours of shifts:
        1st shift—at or after 8:00 a.m.
        2nd Shift—at or after 4:30 p.m.
        3rd Shift—at or after 12:30 a.m.

(b) When a second shift begins after 4:30 p.m., any hours worked after 12:30 a.m. shall be paid at the third shift scale of wages. Any premium time paid on the second shift shall be based on the second shift scale of wages.

(c) When a third shift begins after 12:30 a.m., any hours worked after 8:00 a.m. shall continue to be paid at the third shift scale of wages. Any premium time paid on the third shift shall be based on the third shift scale of wages.

5. The overtime provisions for regular day work shall also apply to shift work. Overtime shall be paid on all hours after the hours outlined above have been worked, i.e.:
        1st shift—8 hours; then overtime applies.
        2nd shift—7½ hours; then overtime applies.
        3rd shift—7 hours; then overtime applies.

6. The Employer shall have the right to designate shift hours earlier than stated above, subject to the approval of the Union.

7. There will be a 24-hour notification to the proper Local Union when any shift work is to be performed.

8. Night Watchmen—It is agreed and understood that these shift provisions do not apply to night watchmen.

9. On work where the regular prescribed shifts cannot be worked, special work time provisions may be arranged between the Employer and the Union.

10. On industrial plant work only, there shall be three (3) days notice before the start of work.

## ARTICLE XXII
## Grievances

1. Either party to this Agreement alleging a violation hereof shall lodge written complaint with the other party hereto by set-

ting forth in a signed statement the grounds for complaint and requesting abandonment of the causes thereof.

2. When the Union is the complainant, it shall lodge its complaint with the representatives of the Employer, and when the Employer is the complainant, he shall lodge his complaint with the Business Manager of the Union.

3. Should the reasonableness of a complaint be challenged by an Employer or by the Union, the representative of said Employer shall meet with the Business Manager of the Union for the purpose of considering and adjusting the matter in controversy.

4. The representative of the Employer shall arrange a convenient time and place for said meeting, which shall be held within twenty-four (24) hours of the time requested for said meeting.

5. It is further agreed that there shall be no stoppage of work due to jurisdictional controversy between the trades and that said jurisdictional controversy arising shall be decided under the rules and regulations as laid down by the National Labor Relations Board. It is further agreed that there shall be no stoppage of work due to any violation or alleged violations of this Agreement, with the exception of the failure to pay current wage rates and fringes.

6. In the event that any complaint is not settled as above outlined, it may be referred by either the Employer or the Union to a committee of six, consisting of three members selected by the Association and three members selected by the Union, which shall be known as the Joint Grievance Committee. The Committee shall meet to hear any controversy submitted to it within five (5) working days of the submission. The decisions of the Committee, which shall be reached by majority vote of the entire Committee, shall be final and binding upon the Employer, the Union and any employee or employees involved. Each decision shall be reduced to writing and signed by the members of the Committee promptly.

7. The refusal or failure by a party to schedule or attend a Joint Grievance Committee meeting provided for in Section 6 shall constitute waiver of all prior irregularities in the grievance procedure, and the complainant may proceed directly to arbitration. If the complainant prevails in the arbitration over such party, that party shall pay all costs of arbitration, excluding attorney fees. If the complainant does not prevail, each party will pay its own costs, except the arbitrator's fee shall be shared equally.

8. If the Committee cannot settle or adjust a matter referred to it, either the Employer or the Union may submit the matter to

arbitration within ninety (90) calendar days before a mutually acceptable arbitrator selected by the Committee. If the Committee cannot agree upon an arbitrator within three (3) working days of the date upon which the matter is submitted to arbitration, then either the Employer or the Union may, within five (5) working days, submit the matter in controversy to the Federal Mediation and Conciliation Service for the selection of an arbitrator in accordance with the applicable rules. The arbitrator's fee shall be shared equally by the Employer and the Union.

9. Once the arbitrator has been selected, the arbitration hearings shall commence on the earliest date available from the arbitrator, unless both sides agree in writing to some other date. Once the date for commencement of hearings has been set, neither party shall request from or be granted by the arbitrator any change in the hearing date without the written consent of the other party.

10. The arbitrator shall confine his decision to the dispute in question and he shall not have authority to add to, subtract from or in any way modify the terms of this Agreement. The arbitrator's decision shall be rendered within thirty (30) days from the date of the hearing and shall be final and binding upon the Employer and the Union, and the employee or employees involved.

11. Members not submitting claims for proper wages or overtime due within thirty (30) days of each pay period, shall be deemed as having waived and vacated their rights to claim. The thirty-day limit does not apply to claims for fringe benefit contributions.

## ARTICLE XXIII
### Liability

1. The Employer agrees that he will not hold the Union liable for any acts of its members not authorized by said Union. The Union agrees that it will, on written request of the Employer, notify the Employer within twenty-four (24) hours after receipt of said request whether the act of the member or members of the Union so complained of was or was not authorized, and if not authorized, the Union agrees that it will take immediate steps to rectify the situation complained of.

2. The Union agrees that it will not hold the Employer liable for any acts of the agents of said Employer not authorized by said Employer. The Employer agrees that he will, on written request by the Union, notify the Union within twenty-four (24) hours after receipt of said request at the office of said Employer, whether or not the act of the Employer's agent so complained of by the Union was authorized, and if not authorized, the Employer agrees that he will take immediate steps to rectify the situation complained of.

## ARTICLE XXIV
## Savings Clause

1. In the event that any portion of this Agreement is declared or becomes inoperative under State or Federal Law, the balance of the Agreement shall remain in full force and effect, and the parties hereto agree to meet and renegotiate the inoperative portion of the Agreement.

## ARTICLE XXV
## Equal Treatment

1. In the event the Union enters into any agreement with another employer or employers containing more favorable terms and/or conditions (including wage rates) than those contained herein, the Union agrees that such more favorable terms and conditions shall automatically be extended to Employers covered by this Agreement. Neither will the Union permit its members to work for any Employer who fails to pay an amount at least equal to the Gross Wage stated in Article V, Section 1, hereof.

## ARTICLE XXVI
## Firebrick, Chimney and Cupola Work

1. The provisions of this Article apply exclusively to firebrick, chimney and cupola work. Except as specifically set forth in this Article, firebrick, chimney and cupola work shall be done under the same terms and conditions set forth in this remainder of the Agreement.

2. A ten minute period for cleaning up shall be allowed at the end of a day's work for each employee employed on firebrick, chimney, cupola work and existing foundries.

3. On all blast furnace work, scaffolding shall be a minimum of three feet high and a maximum of three feet six inches high. All scaffolding in and around blast furnaces and hot stoves shall be of the solid type excepting the large cable type used in the blast furnace. No scaffold shall be raised higher than six inches below the top of a solid wall.

4. No ladders shall extend more than twenty feet without a break or a platform. Ladders must extend between two feet six inches and three feet above landings or floors.

5. On all blast furnace work, at least every fourth scaffold or every twelve feet must be left nailed in place to serve the purpose of a safety scaffold.

6. The Employer shall provide every Laborer with a respirator where dusty conditions prevail, safety goggles on work which endangers or impairs the eyes, and a suitable precaution to

allow employees to be warned of danger in due time where gas exists. The Employer shall be responsible to wet down all dusty places wherever possible.

7. When Laborers are employed on excessively hot work, the Employer shall provide proper counter fatigue aids. When Laborers are handling hot work, the Employer shall provide gloves and protective materials. When Laborers are working on heated surfaces the Employer shall supply wooden shoes or an acceptable facsimile. The Employer shall provide proper gloves when the employee works or handles caustic or corrosive materials.

8. In scaffolding stacks, if the cable type is used, the cables shall be of proven tested strength and planking for the platform shall be of number one grade material and clear of knots. In scaffolding stacks, if a solid wooden scaffold is used, the lumber must be of number one grade. Where the hoist system is used to convey materials on such scaffolds, all safety precautions must be taken and safety signals must be used wherever possible.

## ARTICLE XXVII
### Laborer Show-Up Time

1. Show-Up Time When Weather Does Not Prevent Work:
(a) When Laborers report on the job upon request of the Employer and are not put to work or when they shall have been employed on any job and they shall not be put to work, weather permitting, having reported on said job at the time requested, they shall be paid not less that two (2) hours' pay for so reporting.

2. Show-Up Time When Weather Prevents Work:
(a) At Start of Normal Shift: Laborers shall receive two (2) hours' show-up time at the applicable shift rate.  During these two hours the laborer must stay on the jobsite unless excused by the Employer. On Saturdays all show-up time is paid at time and one-half the applicable shift rate, and on Sundays and holidays at double the applicable shift rate.

(b) If Work Starts During the Said Two Hours: Laborers who start work shall receive pay at the applicable shift rate as though they commenced work at the start of the shift, plus any time worked beyond the two hours.

(c) If a Partial Crew of Laborers is Requested to Report Before Their Normal Shift Hours: They shall remain on the job for early start hour(s), plus two hours into their normal shift. They shall receive one hour's pay at the applicable rate for each hour until their normal shift starting time, and shall remain on the job for the first two hours of their normal shift for which they shall re-

27

ceive two hours' pay at the applicable shift rate.

3. Employees referred to a jobsite where MUST Safety Program certification is required by the project owner employing the contractor, must demonstrate they have the requisite MUST Safety Program certification as required by the project owner to be eligible for employment. If the referred member does not meet this requirement, he will not be eligible for show-up time pay. The contractor is required to provide the Union with the required specifications signed and authorized via facsimile or mail at least 24 hours prior to the request for employees.

## ARTICLE XXVIII
### Training and Educational Fund

1. The Employer shall pay the amount specified in Article V per hour for all hours worked by each Employee covered by this Agreement to the Michigan Laborers' Training Fund.

2. Payment into the Training Fund shall be made in such manner and at such times as authorized and directed by the Trustees of the Fund. The payroll and wage records of the Employer shall be subject to audit by the designated representative of the Trustees, from time to time, for the purpose of determining that payments to the Fund have been computed and paid in accordance with this Agreement.

3. The Employer agrees to be bound by the terms and provisions of the Trust Agreement establishing the Michigan Laborers' Training Fund, dated September 1, 1971, which is hereby made part of this Agreement by reference, and any amendments thereto, and all lawful rules, regulations and requirements adopted by the Trustees of the Fund for the purpose of carrying out the purposes of the Fund.

4. The Trust Agreement establishing the Michigan Laborers' Training Fund, and any amendments thereto, shall be deemed to be a part of this Agreement by reference.

5. The Michigan Laborers' Training Fund shall be jointly administered by a board of up to twelve (12) trustees, six (6) of whom shall be selected by the Michigan Laborers' District Council, one (1) of whom shall be selected by the Michigan Infrastructure & Transportation Association, one (1) of whom shall be selected by the Construction Association of Michigan, two (2) of whom shall be selected by the AGC of Michigan, one (1) of whom shall be selected by the Michigan Distribution Contractors Association; and one (1) of whom shall be selected by Asbestos and Lead Contactors Association.

## ARTICLE XXIX
### Security Deposit

1. There shall be established by appropriate trust agreement a

fund to be known as "Laborers' Security Fund" (hereinafter called the "Fund") to be administered by a joint committee of an equal number of Employers' Trustees and Union Trustees. The Fund shall receive the security deposits and surety bonds required hereunder and hold, administer and disburse the same as provided in the Trust Agreement which is incorporated and made a part hereof by reference.

2. A New Employer or a Delinquent Employer shall have the option of either:

a.  Posting a security deposit of $1,000.00 for each Employee on its payroll as of the date of said written demand, which sum shall be supplemented by $1,000.00 for each additional employee employed under this collective bargaining agreement. This sum deposited shall operate as a security deposit for the succeeding twelve (12) month period, whereupon it will be returned provided no further delinquencies have occurred during such period and provided further it is the judgment of the Trustees that return of the security deposit will not jeopardize future fringe benefit payments; or,

b.  Posting a surety bond in the form specified by the Laborers Security Fund in the amount of $25,000 applicable to the Employer's fringe benefit contributions.

2. A New Employer is defined as an Employer who has been making fringe benefit contributions to the Funds for less than two (2) years. A Delinquent Employer is defined as an Employer who during the preceding consecutive twelve (12) month period has failed to make timely payment of any amounts due the Funds hereunder.  The Laborers Security Fund has authority to waive the delinquent status of an Employer when the status was the result of errors in payment of insignificant amounts, brief delays in payment, or errors due to unintentional clerical mistakes. An Employer may request a refund of his security deposit when he is no longer classified as a New Employer or a Delinquent Employer.

3. (a) The Association may act as surety for an Employer member who may otherwise be required to make a cash deposit or post a surety bond. As such surety the Association must agree in writing to assume liability to the extent but within the limitations of liability that would be imposed on a cash deposit in the amount that would be required of the Employer.

(b) The parties expressly understand and agree that the liability of the Association agreeing to become surety for one of its members shall, unless expressly otherwise provided in writing, be limited to a period not to exceed twelve (12) months suc-

ceeding the execution of such surety obligation but in no event for a period of time when the Employer is not a member of the Association.

4. To the extent provided herein, the deposit of any individual Employer shall secure and guarantee payment of the individual Employer's obligations for the total fringe benefits as required by the Collective Bargaining Agreement but shall not be used to defray the obligations of any other Employer. The obligations of the Employer to the various fringe benefit funds shall be deemed to include cost of collection charges assessed by the said funds for late payment.

5. The total amount of all claims by the various fringe benefit funds for delinquent payments that may be asserted against the deposit for any one Employer shall be limited to the amount accrued during a period of six (6) consecutive calendar months and in no event shall exceed the amount of the deposit required by Section 2 of this Article.

6. A statement of delinquency certified by the administrator of any fringe benefit fund must be based upon an audit, admission of liability or refusal to allow an audit and shall be required before payment from the deposit or surety bond may be made by the Fund.

7. No claims may be asserted and paid from deposits made hereunder for any obligations of Employers accruing during any period prior to the effective date of this Agreement.

8. Weekly Deposits. The Trustees shall have the right, where in their discretion circumstances make it necessary to assure payment of any of the fringe benefits provided for herein, to require that fringe benefit payments shall be made to the depository designated by the Trustee at the end of each pay period, and not later than 4:30 p.m. on Friday of the pay week, by cashier's or certified check to the depository of said Fund of a sum equal to the fringe benefits owing for that pay period. The Employer shall submit reporting forms as otherwise required by the Trustees of said Fringe Benefit Fund.

## ARTICLE XXX
### Substance Abuse

1. In the interest of safety: intoxication, possession, consumption or use of alcoholic beverages or illegal drugs is not permitted on jobsites or while driving a company vehicle.

2. The Employer may require an employee who contributed to or was involved in an accident to be tested for drugs and/or alcohol. In addition to post accident testing, employees may be tested for drugs and/or alcohol in those instances when testing

30

is required by the owner employing the contractor, or by pertinent government regulation; provided, however, that any such testing shall be conducted in accordance with the MUST Drug & Alcohol Screening Program.

3. Employees shall be tested for drugs and/or alcohol during working hours, except as otherwise permitted by the Business Manager. Employees whose final test is negative shall be paid straight-time at the Construction Laborer scale of wages for the time required to take the test(s). Employees whose final test is positive shall receive no pay for the time required to take the test(s).

## ARTICLE XXXI
## Market Recovery

1. It is recognized by the parties that the construction market organized by the building trades unions has encountered strong competition. Where the mutual interest of both the Employer and the Union are served by cooperating to compete more effectively, it is agreed that prior to bidding the Employer and the Union will meet to negotiate a market recovery wage rate or working conditions modifications on a job-by-job basis. Article XXV, "Equal Treatment," shall not apply to market recovery wage rates or working conditions granted to an Employer.

## ARTICLE XXXII
## Changes

1. This Agreement shall continue in effect in all respects until June 1, 2011 and thereafter from year to year in the event that no changes have been provided. If a change in the Agreement is desired by either party hereto, the party seeking the change shall serve written notice thereof upon the other party not less than ninety (90) days prior to June 1 of any year subsequent to June 1, 2011 and prior to the expiration date of this Agreement and a joint meeting of both parties shall then be held for the purpose of discussing the proposed change, and of incorporating such change as may be agreed upon.

2. Employer will notify the Union thirty (30) days prior to any change in company name, ownership or address.

3. Union and Employer to meet periodically to discuss industry problems.

**\*Note—Plan for the Settlement of Jurisdictional Disputes in the Construction Industry.**

It is the intention of the parties that all paragraphs containing reference to the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry be considered deleted and of no present effect. The Construction Association of Michigan is not, on the effective date of this Agreement, a party to any agreement to establish, maintain or participate in the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry or any successor thereof.

If, however, while this Agreement is in force, the Construction Association of Michigan, becomes signatory to any agreement to participate in the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry or any successor thereof to which the Laborers International Union of North America is also a party, then that agreement and any rules or regulations adopted thereunder shall become a part of this Agreement by reference and the paragraphs considered deleted and of no effect on the effective date hereof shall be reinstated as though they had never been deleted.

IN WITNESS WHEREOF, we, the undersigned, duly authorized representatives of the Construction Association of Michigan and the Laborers' International Union of North America, AFL-CIO, Local Union No. 1076, in the Metropolitan Area of Detroit, Michigan, do hereby affix our signatures.

Dated: June 1, 2009

**Laborers' International Union of North America, AFL-CIO, Local Union No. 1076**
William Bass, Business Manager

**Michigan Laborers' District Council**
G. Jorgensen
C. Chwalek

**Construction Association of Michigan**
Patrick W. Baker, Director of Labor Relations

## MEMORANDUM OF UNDERSTANDING
## OPTIONAL FOUR-TEN WORKWEEK

The Union agrees that the Employer may work a 4-10 work-week on a particular job as provided below only under the following circumstances:

1. Carpenters, Cement Masons, Operating Engineers and Bricklayers which work in conjunction with the Laborers who are to work 4-10s, whether these Laborers are employed by the Employer or by a subcontractor of the Employer, must also work the 4-10 workweek under conditions which are substantially similar to those appearing below.

(a) At the beginning of a job or at any time during its duration, and for a minimum of one (1) week, the Employer shall have the option of scheduling work on either Monday through Thursday or on Tuesday through Friday for ten (10) hours each day at straight-time. Work in excess of ten (10) hours but less than twelve (12) hours per day (Monday through Thursday or Tuesday through Friday) shall be paid at time and one-half. Work in excess of twelve (12) hours per day (Monday through Thursday or Tuesday through Friday) shall be paid at double time. The 4-10 workweek may be used by an Employer on a job basis or a crew basis only. The 4-10 workweek may be used only under the following circumstances:

1. When the Employer elects to use the 4-10 work-week under this Memorandum, he will notify the Local Union involved and inform the Local Union of the work schedule as soon as possible prior to its implementation.

2. In the event one (1) or more hours of work are unable to be performed because of bad weather or because of a holiday when 4-10s are worked Monday through Thursday, the Employer may schedule work on Friday of that week for a minimum of eight (8) hours. Work in excess of forty (40) hours for the week (Monday through Friday) but not more than forty-eight (48) hours shall be paid at time and one-half. Work in excess of forty-eight (48) hours for the week (Monday through Friday) shall be paid at double time. Eight hours of work may be performed on Saturdays at time and one-half. Work on Saturdays in excess of eight (8) hours shall be paid at double time.

3. On any job scheduled to work a makeup day, the Employer shall not bring employees to the job to avoid the payment of premium time.

4. For days when ten hours of work is scheduled, Article XVIII, "Concrete Pours," and Section 8 of Article V shall apply with the modification that the eighth hour shall be substituted for the sixth hour, and the tenth hour shall be substituted for the eighth hour.

33

5. When work is performed under the 4-10 workweek schedule, payday shall be one of the workdays. Once payday has been established on a project under this Memorandum, that day shall remain the payday whenever 4-10s are worked.

6. The Employer shall not schedule 4-10s during periods of darkness unless lighting is provided.

**Laborers' International Union of North America, AFL-CIO, Local Union No. 1076**
  William Bass, Business Manager

**Michigan Laborers' District Council**
  G. Jorgensen
  C. Chwalek

**Construction Association of Michigan**
  Patrick W. Baker, Director of Labor Relations

CONTRACT TO BE EXECUTED BETWEEN AN EMPLOYER WHO IS NOT A MEMBER OF THE SIGNATORY GROUPS COVERED BY THIS AGREEMENT.

The undersigned Employer hereby recognizes the Union as the sole and exclusive collective bargaining representative of all those employed by the Employer as laborers in the geographical area described in the preamble to the foregoing agreement on all present and future jobsites based upon the fact, acknowledged by the Employer to be true, that the Union represents and has represented a majority of those employees.

The Employer agrees to adopt the foregoing agreement negotiated by the Construction Association of Michigan (hereinafter called the "Association"), to be bound by all the terms and conditions of the Agreement and amendments thereto, including the effective dates, and to become a party thereto. It is also agreed by the undersigned Employer that any notice given by the Union to the Association pursuant to Article XXXII of the Agreement shall be notice to the Employer and shall have the same legal force and effect as though it were served on the Employer personally.

Finally, the Employer agrees that, unless the Union is notified to the contrary by the Employer by registered or certified mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, the Employer will be bound by and adopt any Agreement reached by the Union and the Association during negotiations which follow notice by the Union referred to in the preceding paragraph.

Firm Name .............................................................................

.............................................................................................

Address..................................................................................

.............................................................................................
            City                    State                   Zip Code

☐ Employer is sole proprietorship. Correct name of owner is:

.............................................................................................
    Owner                        (Please print)

☐ Employer is a partnership. Correct names of partners are:

..............................................................................................
Partner                     (Please print)

..............................................................................................
Partner                     (Please print)

☐ Employer is a corporation. Correct names of officers are:

..............................................................................................
President                (Please print)

..............................................................................................
Secretary                (Please print)

Michigan Corporation and Security
  Commission Registration No. ...............................................

Michigan Employment Security
  Agency (MESA) Registration No. .........................................

Employer's Social Security
  and Withholding Tax No. ......................................................

Workers' Compensation No. ...................................................

Expiration ................................................................................

Insurance Firm ........................................................................

Laborers' Metropolitan Detroit
  Health & Welfare Fund ............................................................

Laborers' Pension Fund No. ....................................................

FOR THE EMPLOYER

By ...........................................................................................
                                             (Title)

Date.........................................

Phone......................................Fax ..........................................

E-Mail Address ........................... ...........................................

FOR THE UNION

By ..................................................................... .......................

**2009 - 2011**
**DEMOLITION AGREEMENT**

This Agreement, made as of June 1, 2009, by and between contractors who become signatory to this Agreement (hereinafter referred to as the "Employers") and the Michigan Laborers' District Council for and on behalf of its affiliated Local Unions Numbers 1076 and 1191 and their geographical jurisdictions (hereinafter referred to as the "Union").

**Purpose**

The Employers are engaged in demolition, dismantling and salvage work in the counties of Wayne, Oakland, Macomb and a portion of Livingston County north of the State Highway M-59 and east of Oak Grove Road. The Union and the Employers by this Agreement intend to establish uniform rates of pay, hours of employment, working conditions and the contribution rates for all fringe benefits for the employees covered by this Agreement.

**ARTICLE I**
**Scope of Agreement**

The provisions of this Agreement shall apply to demolition work, which work shall be the work of the Laborers. All work shall be done under the same terms and conditions as set forth in the current contract between the Construction Association of Michigan and Laborers' Locals 1076/1191 (hereinafter referred to as the Master Agreement), except where specifically modified by this Agreement.

**ARTICLE II**
**Terms and Conditions**

The following terms and conditions apply with respect to work performed by Employers covered by this Agreement:

1. A ten minute period for cleaning up shall be allowed before lunch and again at the end of a day's work.

2. A Demolition Laborer shall be the same hourly pay rate as the hourly pay rate for a Construction Laborers in the Master Agreement.

3. Ground Burner Base Wage shall be fifty cents ($.50) per hour more than the hourly rate for a Demolition Laborer (Construction Laborer).

4. High Burner Base Wage shall be one dollar ($1.00) per hour more than the hourly rate for Demolition Laborer (Construction Laborer).

5. Foreman Base Wage shall be one dollar and twenty-five cents ($1.25) per hour more than the highest hourly rate paid to the Demolition Laborer (Construction Laborer) under his super-

vision.

6. Article VI (Sweeper/Cleaner) and Article VII (Furniture Laborer) are not incorporated into this Demolition Agreement.

## ARTICLE III
### Termination

This Demolition Agreement shall continue in effect in all respects until June 1, 2011, and thereafter from year-to-year in the event no changes have been provided. If a change in the Agreement is desired by either party, the party seeking the change shall serve written notice upon the other party not less than ninety (90) days prior to the expiration date of this Agreement. The expiration date is the specific date referenced above, as well as any expiration date that is a result of the Agreement's year-to-year renewal. It is expressly agreed by the undersigned Employer that any notice given by the Union to the Construction Association of Michigan (Association), pursuant to the terms of the Master Agreement, of the Union's desire to change the Master Agreement shall be notice to the undersigned Employer of the Union's desire to change the Demolition Agreement and shall have the same legal force and effect as though it was served on the undersigned Employer personally.

In addition, the undersigned Employer specifically agrees that, unless the Union is notified to the contrary by the undersigned Employer by registered or certified mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, the Employer will be bound by and adopt any changes in the terms and conditions in the Master Agreement agreed to by the Union and the Association during their negotiations which follow notice by the Union to the Association as discussed above.

Firm Name ..............................................................................

..............................................................................................

Address...................................................................................

..............................................................................................
      City             State           Zip Code

☐ Employer is sole proprietorship. Correct name of owner is:

......................................................................
Owner                     (Please print)

☐ Employer is a partnership. Correct names of partners are:

......................................................................
Partner                   (Please print)

......................................................................
Partner                   (Please print)

☐ Employer is a corporation. Correct names of officers are:

......................................................................
President                 (Please print)

......................................................................
Secretary                (Please print)

Michigan Corporation and Security
  Commission Registration No.................................................

Michigan Employment Security
  Agency (MESA) Registration No. .........................................

Employer's Social Security
  and Withholding Tax No........................................................

Workers' Compensation No. ....................................................

Expiration ................................................................................

Insurance Firm........................................................................

Laborers' Metropolitan Detroit
  Health & Welfare Fund.........................................................

Laborers' Pension Fund No.......................................................

FOR THE EMPLOYER

By ...........................................................................................
                                                (Title)

Date.........................................

Phone.......................................Fax ..........................................

E-Mail Address .........................................................................

FOR THE UNION

By .............................................................................................

**2009-2011
Industry Advancement
Program Agreement**

between the

Construction Association of Michigan

and

Laborers' Local 1076 of the
Laborers' International Union
of North America, AFL-CIO

## INDUSTRY ADVANCEMENT PROGRAM AGREEMENT

A. The Association shall establish an Industry Advancement Program whose activities shall be financed by the payments provided for in Article XIV of the Agreement. No Employer or Union has or shall have any right, title, interest or claim, legal or equitable, in or to any payments made or to be made for allocation to said Industry Advancement Program, nor shall any part of the fund or assets of said Industry Advancement Program or any part of any payments allocated to the Industry Advancement Program at any time be paid to any Employer or to any other employer who is a party to an agreement with the Union requiring the same payments as provided for in Article XIII, or to any employee, or to the Union except to finance such activities or benefits as are or shall be carried on in accordance with the provisions of this Supplemental Agreement, or except as part, and in the form of, the activities and the benefits thereunder which the Association, as administrator of said Industry Advancement Program, may undertake in accordance with the provisions of this Supplemental Agreement; and provided further nothing herein before contained shall be deemed in any way to limit or affect the right of the Union to compel any Employer or such other employer by legal or equitable action or otherwise to fulfill his obligation to make payments to said Industry Advancement Program, or to collect in any bankruptcy, reorganization or similar proceeding any such payments due from and unpaid by any Employer or other employer, and provided further, that nothing hereinbefore contained shall affect the Association's rights to subrogation. Upon termination of payments allocable to the Industry Advancement Program, by reason of the expiration of this Agreement or because of the absence, or any other reason, of a contractual obligation upon the Employer to make payments so allocable, the assets and fund of the Industry Advancement Program shall not be distributed among any Employers or other employers, or among employees, or to the Union but shall be held by the Association, which shall continue to administer and expand said assets and fund for the purposes, and subject to all the conditions, set forth herein.

The Association may use the monies allocated and paid into the fund of the Industry Advancement Program, and the income from the investment thereof, for the purpose of meeting all costs to the Association (including, but not limited to rent, salaries of staff and legal counsel fees, office expense, cost of equipment, printing, stationery and items in the nature thereof), for carrying out the following industry-wide activities within the counties covered by this Agreement, for the benefit of the building and construction industry as a whole within said counties and particularly for the benefit of employers making payments allocated to the Industry Advancement Program, except as an expenditure for any such activity is prohibited by Section B of this Supplement.

42

(1) **ACCIDENT PREVENTION.** For example, the costs for promoting a Safety Campaign to help prevent personnel accidents in the industry. The Association shall designate one of its staff to act on all matters pertaining to safety, whose duties shall be, among others, to distribute to Employers and employees literature advocating, explaining and promoting accident prevention; to meet with authorized representatives of the Union when necessary for discussion of matters of safety and accident prevention; to attend meetings and conferences dealing with safety and accident prevention; and to engage in similar activities for the promotion of safety and accident prevention.

(2) **EDUCATION.** For example, to create, operate and maintain programs for the benefit of the building and construction industry as a whole within the counties aforesaid, such as schools for Estimators, Construction Superintendents, Foremen and other supervisory personnel.

(3) **RESEARCH INTO NEW METHODS AND MATERIALS.** For example, to investigate new methods and new materials for use in the building and construction industry and establish the necessary machinery to see to it that the assignment of work with or upon such methods or materials is made, subject to the applicable provisions of Article I of the Agreement, to the correct Trade in order to avoid jurisdictional disputes.

(4) **PUBLIC RELATIONS.** For example, to conduct a Public Relations Program for the benefit of the building and construction industry in the aforesaid counties, particularly to make an effort to obtain the work in industrial plants.

(5) **INDUSTRY RELATIONS** with architects, engineers, building owners, government officials, subcontractors, material and equipment suppliers, manufacturers, and insurance and bonding companies.

(6) **LABOR RELATIONS.** For example, to pay the compensation of the representatives of the Association participating in collective bargaining negotiations and grievance meetings with representatives of the Union; to pay the compensation of the representative or representatives of the Association in the presentation of any dispute to an arbitrator, as well as Management's share of the expenses and compensation of the arbitrator; to pay the expenses and compensation of witnesses in any grievance or arbitration proceedings; and to defray the expenses of said representatives in connection with the foregoing services and the cost to the Association of informative literature and other publications and usual sources of information relevant to collective bargaining and the processing of grievances, as well as the cost of disseminating such information among the members of the Association and other employers in the building

43

and construction trades industry.

(7) **MANAGEMENT PARTICIPATION IN UNION HEALTH AND WELFARE FUNDS AND SIMILAR FUNDS.** For example, to pay the compensation and the necessary expenses incurred in connection with their services as such, of the representatives of the Employers upon the Laborers Metropolitan Detroit Health & Welfare Fund, the Laborers Pension Fund, the Laborers Vacation and Holiday Fund, and upon any other body composed jointly of representatives of Employers and representatives of employees.

(8) **MARKET DEVELOPMENT.** For example, to educate industrial owners and government awarding authorities and agencies to contract out construction maintenance and repair work.

(9) **STANDARDIZATION OF CONTRACTS AND SPECIFICATIONS.** For example, to see to it that the architect states in the specifications at the proper place and with sufficient particularity an adequate definition of the work to be performed, thereby eliminating many needless jurisdictional disputes by improper assignment of work in the first instance.

(10) **DISASTER RELIEF AND CIVILIAN DEFENSE.**

B. No part of this fund allocated to the Industry Advancement Program shall be spent directly or indirectly for any of the following or similar purposes:

(1) Lobbying, publicity or other endeavors in the promotion of legislation, existing or proposed, opposed by either the AFL-CIO, the International Union of Laborers, or in opposition to legislation, existing or proposed, which is sponsored or favored by the AFL-CIO, the International Union of Laborers.

(2) Subsidies, indemnities or payments of any kind to contractors, during, for, or in connection with a period or periods of strike, lockout or work stoppage, or payments to any fund, insurance carrier, or other person or entity as a premium for, or in consideration of payment by such fund, insurance carrier, or other person or entity, of such subsidies or indemnities or payments to contractors.

(3) Litigation of any kind before any court or administrative body against the Union, or any of the members of the Union, or the payments of any costs or expenses directly or indirectly involved in such litigation.

(4) Payment of dues to, or the making of any other contribution, directly or indirectly, to the Construction Association of Michigan, or to its successor or to any like organization.

(5) Publicity or public relations campaigns in support of Management's position respecting pending or prospective collective bargaining negotiations with the Union or in support of Management's point of view on any matter involving the industry which could, directly or indirectly, affect the availability of work or employment for, or the wages or conditions of employment of the members of the Union, when such point of view is opposed by the Union.

(6) Any activity injurious to the Union or any of its affiliated locals. In the event that any activities of a program commenced by the Association were not apparent at the time of their commencement to be injurious to the Union, but later a complaint is made by the Union to the Association that any such activity is injurious to the Union, then, whether such activity or activities shall be continued and whether said activity or activities shall be financed out of monies already paid into the Industry Advancement Program or to be paid into the Industry Advancement Program, shall if there is no agreement between the Association and the Union as to the complaint made, on the demand of either side, made no later than thirty (30) days after the date of the complaint, be submitted for arbitration to an arbitrator selected by lot from a list supplied by the American Arbitration Association. The arbitrator shall hold the hearing and render his award within five days after his selection, which award shall be final and binding upon the parties hereto. In arriving at his award, the arbitrator shall be governed as follows:

(A) In the event that the Association's obligation is only to pay for the activity of said program on a current basis as the activity progresses.

(i) Then if the Association alters or discontinues the program pending the arbitration of the Union's complaint, the Association shall have no obligation to reimburse the funds of the Industry Advancement Program for any monies it has paid or may be obligated to pay for such of said activities as preceded the date of Union's complaint.

(ii) If pending such arbitration the Association does not discontinue or alter the program to meet the Union's complaint, then the question to be decided by the arbitrator, in addition to whether the program or some phase of it was injurious to the Union, shall be as follows:

(a) Was it within the control of the Association to discontinue or modify the program? If the answer is that it was not within the Association's control, then the Association shall not be obligated to reimburse the funds of the Industry Advancement Program for the monies spent during the period between the date of the complaint and the date of the arbitrator's award.

(b) If the award is that it was within the control of the Association, then the arbitrator shall be asked to decide an additional question, viz., would the discontinuance or alteration of the program have caused more harm to the Association than it would have caused to the Union. If the answer is in the affirmative, then, again, the Association shall be absolved of any liability to reimburse the funds of the Industry Advancement Program for payments made between the date of the Council's complaint and the date of the award. If the answer is in the negative, Association shall reimburse to the funds of the Industry Advancement Program such expenditures as were made and incurred between the date of the Union's complaint and the date of the award.

(B) Where the financing of the activities of the program is by prepayment either at the inception of the program or at various points after its inception, or is provided for by a contract which would impose upon the Association an irreducible obligation for a fixed amount irrespective of continuance or discontinuance of the program, then if the Union complains that any of the activities of the program are injurious to the Union and the Association does not discontinue or modify such activities to meet the Union's complaint, and if the arbitrator awards that any of the activities of the program are injurious to the Union, then the Association shall be obligated to reimburse the funds of the Industry Advancement Program for a portion of such prepayment or fixed amount as the quantity of service or time utilized in said program's activities after Union's complaint and until compliance with the arbitrator's award bears to the whole quantity of the service to be rendered or to the whole of the time to be utilized for the activities so prepaid or contracted for.

In any event, if the arbitrator's award is that any of the activities of the program were injurious, then, from the date of the award the Industry Advancement Program's funds may not be used to continue such activities of the program unless altered to obviate injury to the Union, although the program may be continued in its original form by the Association out of its own funds.

C. None of the provisions in Section B of this Supplement shall operate to prohibit any communication from the Association to its members at any time, nor to prohibit the expression by such of the Association's representatives as are paid with the monies of the Industry Advancement Program of any position of the Association or its members in collective bargaining or in the adjustment or arbitration of grievances or in negotiations of any matter affecting wages or conditions of employment of the members of the Union.

D. An Annual Audit listing the actual expenditures made during the preceding year out of the funds of the Industry Advancement

Program will be made and certified by a Certified Public Accountant. This audit will be mailed to the Union.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective proper officers, duly authorized this 1st day of June, 2009.

**Laborers' International Union of North America, AFL-CIO, Local Union No. 1076**
  William Bass, Business Manager

**Michigan Laborers' District Council**
  G. Jorgensen
  C. Chwalek

**Construction Association of Michigan**
  Patrick W. Baker, Director of Labor Relations

47

## MANUAL OF LABORERS' UNION
## JURISDICTIONAL CLAIMS

TENDERS: Tending masons, plasterers, carpenters and other building and other construction crafts.

Tending shall consist of preparation of materials and the handling and conveying of materials to be used by mechanics of other crafts, whether such preparation is by hand or any other process. After the material has been prepared, tending shall include the supplying and conveying of said material and other materials to such mechanic, whether by bucket, hod, wheelbarrow, buggy or other motorized unit used for such purpose, including fork lifts when used at levels not in excess of nine feet.

Unloading, handling and distributing of all materials, fixtures, furnishings and appliances from point of delivery to stockpiles and from stockpiles to approximate point of installation.

Drying of plaster, concrete, mortar or other aggregate, when done by salamander heat or any other drying process.

Cleaning and clearing of all debris, including wire brushing of windows, scraping of floors, removal of surplus material from all fixtures within confines of structure and cleaning of all debris in building and construction area. The general cleanup, including sweeping, cleaning, washdown and wiping of construction facility, equipment and furnishings and removal and loading or burning of all debris including crates, boxes, packaging waste material. Washing or cleaning of walls, partitions, ceilings, windows, bathrooms, kitchens, laboratory, and all fixtures and facilities therein. Clean-up, mopping, washing, waxing and polishing or dusting of all floors or areas.

The aging and curing of concrete, mortar and other materials applied to walls, floors, ceilings, and foundations of buildings and structures, highways, airports, overpasses and underpasses, tunnels, bridges, approaches, viaducts, ramps or other similar surfaces by any mode or method.

SCAFFOLDS: Erection, planking and removal, of all scaffolds for lathers, plasterers, bricklayers, masons and other construction trades crafts. Building, planking or installation and removal of all staging, swinging and hanging scaffolds, including maintenance thereof. Where self-supporting scaffolds or staging over fourteen feet (14') in height or specially designed scaffolds are built by Carpenters, Laborers shall tend said Carpenters on erection thereof; the dismantling of said scaffolds, as well as preparation for foundation or mud-sills for said scaffolds and maintenance of same shall be done by Laborers.

CONCRETE, BITUMINOUS CONCRETE AND AGGREGATES:

(a) Concrete, bituminous concrete, or aggregates for walls, footings, foundations, floors or for any other construction. Mixing, handling, conveying, pouring, vibrating, gunniting and otherwise placing concrete or aggregates, whether done by hand or any other process. Wrecking, stripping, dismantling and handling concrete forms and false work. Building of centers for fireproofing purposes. Operation of motorized wheelbarrows or buggies or machines of similar character, whether run by gas, diesel or electric power. When concrete or aggregates are conveyed by crane or derrick, or similar methods, the hooking on, signaling, dumping, and unhooking the bucket. Placing of concrete or aggregates, whether poured, pumped, gunnited, or placed by any other process. The assembly, uncoupling of all connections and parts of or to equipment used in mixing or conveying concrete, aggregates or mortar, and the cleaning of such equipment, parts and/or connections. All vibrating, grinding, spreading, flowing, puddling, leveling and strike-off of concrete or aggregates by floating, rodding or screening, by hand or mechanical means prior to finishing. Where pre-stressed or pre-cast concrete slabs, walls or sections are used, all loading, unloading, stockpiling, hooking on, signaling, unhooking, setting and barring into place of such slabs, walls or sections. All mixing, handling, conveying, placing and spreading of grout for any purpose. Green cutting of concrete or aggregate in any form, by hand, mechanical means, grindstones or air or water.

(b) The filling and patching of voids, crevices, etc., to correct defects in concrete caused by leakage, bulging, sagging, etc.

(c) The loading, unloading, carrying, distributing and handling of all rods, mesh and material for use in reinforcing concrete construction. The hoisting of rods, mesh and other materials except when a derrick or outrigger operated by other than hand power is used.

(d) All work on interior concrete, columns, foundations for engine and machinery beds.

(e) The stripping of forms, other than panel forms which are to be re-used in their original form, and the stripping of forms on all flat arch work.

The moving, cleaning, oiling and carrying of all forms to the next point of erection.

The snapping of wall ties and removal of tie rods. Handling, placing and operation of the nozzle, hoses and pots or hoppers on sandblasting or other abrasive cleaning. The jacking of slip forms, and all semi and unskilled work connected therewith.

DRILLING AND BLASTING: All work of drilling, jackhammering and blasting. Operation of all rock and concrete drills, including handling, carrying, laying out of hoses, steel handling, installation of all temporary lines and handling and laying of all blasting mats. All work in connection with blasting, handling and storage of explosives, carrying to point of blasting, loading holes, setting fuses, making primer and exploding charges. All securing of surfaces with wire mesh and any other material and setting of necessary bolts and rods to anchor same. All high scaling and other rock breaking and removal after blast. Handling and laying of nets and other safety devices and signaling, flagging, road guarding.

SIGNALMEN: Signalmen on all construction work defined herein, including traffic control signalmen at construction sites.

GENERAL EXCAVATION AND GRADING: The clearing, excavating, filling, back-filling, grading and landscaping of all sites for all purposes and all labor connected therewith, including chainmen, rodmen, grade markers, etc.

PITS, YARDS, QUARRIES, ETC.: All drillers, blasters and/or powdermen, nippers, signalmen, laborers in quarries, crushed stone yards and gravel and sand pits and other similar plants, including temporary and portable Batching Plants.

WRECKING: The wrecking or dismantling of buildings and all structures. Breaking away roof materials, beams of all kinds, with use of cutting or other wrecking tools as necessary. Burning or otherwise cutting all steel structural beams. Breaking away, cleaning and removal of all masonry and wood or metal fixtures for salvage or scrap. All hooking on and unhooking and signaling when materials for salvage or scrap are removed by crane or derrick. All loading and unloading of materials carried away from the site of wrecking. All work in salvage or junk yards in connection with cutting, cleaning, storing, stockpiling or handling of materials. All clean-up, removal of debris, burning, back-filling and landscaping of the site of wrecked structure.

RAILROAD TRACK WORK: Right-of-way clearance as described above, excavation, grading, subgrading, ballasting and compacting of right-of-way. Loading, unloading, stockpiling, handling and distribution of track and ties and placing of or jacking track and ties at point of installation. All burning or otherwise cutting of track. Setting of tie plates, bolting, leveling and gauging of rails and all spiking, whether by hand or mechanical means. Placing and tamping of ballast by hand or mechanical means. Construction and/or relocation of mainlines, shoe flys, sidings, gradings, crossings, relocating of pipes and drainage and culverts connected with same and removal and replacing of all fences.

USE OF TOOLS: Operation of all hand, pneumatic, electric, motor, combustion or air-driven tools or equipment necessary for the performance of work described herein.

MISCELLANEOUS: All such work and jurisdiction as may have been acquired by reason of amalgamation or merger with former national or international unions and as may be hereafter acquired; including all such work and jurisdiction as declared by actions of the Executive Council or conventions of the American Federation of Labor.

**Construction Association of Michigan**
43636 Woodward Ave.
Bloomfield Hills, Michigan 48302
Phone (248) 972-1000
Patrick Baker, Director of Labor Relations

★

**Laborers Local 1076**
760 Joslyn Ave.
Pontiac, Michigan 48340
Phone (248) 334-0509
William Bass, Business Manager
Paul Gassel, Secretary-Treasurer

# 2009-2011

# LABORERS AGREEMENT

entered into between

**Construction Association of Michigan**

and

**Michigan
Laborers' District Council**

and

**Local Union No. 1076 of the
Laborers' International Union
of North America
AFL-CIO**

**PONTIAC, MICHIGAN**

# LABORERS' INTERNATIONAL UNION of NORTH AMERICA

William Bass
Business Manager



Paul Gassel
Secretary-Treasurer

760 Joslyn Avenue, Pontiac, Michigan 48340
248-334-0509   248-334-0584 Fax

## INTERIM AND SUPPLEMENTAL AGREEMENT

The undersigned Employer agrees to voluntarily recognize Laborers' Local 1076, Michigan Laborers' District Council and the Laborers' International Union of North America, hereafter called the Union, as the sole and exclusive bargaining agent under Section 9 (a) of the National Labor Relations Act for all laborers employed by Employer on all of the Employer's present and future job sites with the Union's geographic jurisdiction based upon the fact, acknowledged by the Employer to be true, that the Union has requested recognition as Section 9 (a) representative of such employees and the Union has shown, or has offered to show, evidence of its majority support.

The Employer agrees that on and after this date _February 26, 2010_____, it will abide by all the terms of the Agreement effective June 1, 2009 through May 31, 2011, as negotiated between the **Construction Association of Michigan**, hereafter called the Association, and the Union, and to become a party thereto. It is also agreed by the undersigned Employer that any notice given by the Union to the Association pursuant to Article XXXIII of the Agreement shall be notice to the Employer and shall have the same legal force and effect as though it were served upon the Employer personally. Finally, the Employer agrees that, unless the union is notified to the contrary by the Employer by registered mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, the Employer will be bound by and adopt any Agreement reached by the Union and the Association during negotiations which follow notice by the Union referred to in the preceding sentence.

WILL THE RESPONSIBLE PARTY OF YOUR FIRM PLEASE SIGN THIS INTERIM AGREEMENT AND RETURN ONE COPY IN THE ENCLOSED SELF-ADDRESSED ENVELOPE. THE OTHER COPY IS FOR YOUR FILES. THE AGREEMENT IN BOOKLET FORM WILL BE MAILED TO YOU WHEN RELEASED BY THE PRINTER.

Listed below are the wage rates for construction laborers for that part of the Metropolitan Detroit area consisting of Oakland County and that portion of Livingston County North of State Highway M-59 and East of Oak Grove Road.

Effective first full payroll period commencing on or after:

**CONSTRUCTION LABORER**

|  | June 1, 2009 | June 1, 2010 |
|---|---|---|
| Base Wage | $23.09 * | $0.80 ** |
| Vacation and Holiday | 2.45 * | |
| Health Care | 5.95 | Breakdown to be |
| Pension | 6.85 | determined |
| Education and Training | .37 | at a later date. |
| LECET | .05 | |
|  | $38.76 | |
| IAP | .10 | |
| Laborer Foreman Base Wage | $24.34 | |

*subject to Federal Withholding & FICA

Firm Name _Altchem Environmental Services, Inc._

Signing for Employer _____

Address _1300 Industrial Blvd   Unit 5   Southampton   PA   18966_
Street            City        State   Zip

Phone _215-953-8500_          Date _2/26/2010_

For the Union _____

[2009CAM6.09]